No. 13-15633

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____


PADRES HACIA UNA VIDA MEJOR and EL PUEBLO PARA EL AIRE Y
AGUA LIMPIO

*Plaintiffs-Appellants,*

v.

LISA P. JACKSON, Administrator of the U.S. Environmental Protection Agency,
and U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Defendants-Appellees,*

_____

On Appeal from the United States District Court for the
Eastern District of California
Case No. 1:11-cv-1094 AWI BAM
Hon. Anthony W. Ishii
_____

**OPENING BRIEF OF APPELLANT
EL PUEBLO PARA EL AIRE Y AGUA LIMPIO**


Christopher G. Winter                   Brent Newell
CRAG LAW CENTER                    CENTER FOR RACE POVERTY AND
917 SW Oak St.                          THE ENVIRONMENT
Suite 417                               47 Kearney Street; Suite 804
Portland, OR 97205                      San Francisco, CA 94108
T: 503-525-2725                         T: 415-346-4179 x 304

August 12, 2013                        Attorneys for Plaintiff-Appellant El
                                       Pueblo Para El Aire Y Agua Limpio

## COROPRATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Appellant El Pueblo Para El Aire y Agua Limpio hereby states that it does not have

has any parent companies, subsidiaries, or affiliates that have issued shares to the

public.

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION ............................................................ 1

    I.    Statutory Basis of Subject Matter Jurisdiction of the District Court ......... 1

    II.   Jurisdiction of the Court of Appeals and Timeliness of Petition for Review ...................................................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 2

STATEMENT OF THE CASE ................................................................ 2

    I.    Nature of the Case ................................................................... 2

    II.   Background on Title VI of the Civil Rights Act ........................................ 4

    III.   Statement of Facts and Procedural History ................................................ 5

           A.    El Pueblo's Title VI Complaint and Proceedings Below ................... 5

           B.    EPA's Pattern and Practice of Illegal Delay in Administering the Title VI Program ................................................................. 8

SUMMARY OF ARGUMENT ................................................................ 12

ARGUMENT ................................................................................. 15

    I.    Standard of Review ................................................................ 15

    II.   Mootness, the Voluntary Cessation Doctrine and *Rosemere Neighborhood Association v. EPA* ................................................................. 16

    III.   EPA Changed its Conduct in Response to the Threat of Judicial Scrutiny 19

    IV.   The District Court Erred in Dismissing El Pueblo's Claim for Declaratory Relief ................................................................. 20

           A.    The District Court Erred in Finding that a Declaratory Judgment Would not Provide Effective Relief for El Pueblo ........................ 22

B.    The District Court Erred as a Matter of Law in Disregarding *Rosemere* and by Failing to Apply the Appropriate Burden of Proof in Considering EPA's Motion to Dismiss ..................................... 26

V.    Applying the Correct Legal Standard, EPA Has Not Met its "Heavy Burden" in Demonstrating Mootness ....................................................... 28

A.    EPA Has Not Demonstrated That It is "Extremely Unlikely" that El Pueblo Will File Another Title VI Complaint.................................... 29

B.    EPA Has Not Demonstrated That if El Pueblo Filed Another Title VI Complaint, EPA Will Meet its Regulatory Deadlines in Resolving It 33

VI.    The Requested Declaratory Judgment Constitutes Effective Relief....... 36

CONCLUSION ................................................................................ 37

# TABLE OF AUTHORITIES

## CASES

*Am. Rivers v. Nat'l Marine Fisheries Serv.,*
    126 F.3d 1118 (9th Cir. 1997) .......................................................... 16

*Armster v. U.S. D. Ct. for the Cent. D. of Cal.,*
    806 F.2d 1347 (9th Cir. 1986) .......................................................... 19

*Biodiversity Legal Found. v. Badgley,*
    309 F.3d 1166, 1174 (9th Cir. 2002) ........................................... 9, 25

*Conservation Cong. v. U.S. Forest Serv.,*
    _ F.3d __, 2013 WL 2631449 (Jan. 13, 2013) ................................. 27

*Del Monte Fresh Produce Company v. United States,*
    570 F.3d 316 (2009) ......................................................................... 25

*Forest Guardians v. Johanns,*
    450 F.3d 455 (9th Cir. 1988) .......................................................... 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services,*
    528 U.S. 167 (2000) ........................................... 17, 19, 27, 33, 36

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) .......................................................... 16

*La Reunion Francaise SA v. Barnes,*
    247 F.3d 1022 (9th Cir. 2001) .......................................................... 16

*Liner v. Jafco, Inc.,*
    375 U.S. 301, 306 (1964) .................................................................. 16

*Los Angeles County v. Davis,*
    440 U.S. 625 (1979) .......................................................................... 18

*Lucien v. Johnson,*
    61 F.3d 573 (7th Cir. 1995) .............................................................. 18

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ....................................................................... 24

*Luckie v. EPA,*
  752 F.2d 454 (9th Cir. 1985) .................................................... 30, 33

*Natural Res. Defense Council, Inc. v. EPA,*
  966 F.2d 1292 (9th Cir. 1992) .......................................................... 37

*Or. Advocacy Ctr. v. Mink,*
  322 F.3d 1101 (9th Cir. 2003) .......................................................... 16

*Outdoor Media Group Inc. v. City of Beaumont,*
  506 F.3d 895 (9th Cir. 2007) ..................................................... 16, 23

*Payne Enterprises v. U.S.,*
  837 F.3d 486 (D.C. Cir. 1988)........................................................... 25

*Porter v. Bowen,*
  496 F.3d 1009 (9th Cir. 2007) ................................................... 17, 18

*Pub. Util. Comm'n v. FERC,*
  100 F.3d 1451 (9th Cir. 1996) .................................................. 16, 22

*Rosemere Neighborhood Association v. EPA,*
  581 F.3d 1169 (9th Cir. 2009) ................................................. *passim*

*S. Or. Barter Fair v. Jackson County, Or.,*
  372 F.3d 1128 (9th Cir. 2004) ..................................... 16, 17, 23, 30

*San Diego County Gun Rights Comm. v. Reno,*
  98 F.3d 1121 (9th Cir. 1996) ........................................................... 28

*Skysign International v. City and County of Honolulu,*
  267 F.3d 1109 (9th Cir. 2002) .......................................................... 22

*Steel Co. v. Citizens for a Better Environment,*
  523 U.S. 83 (1998) ........................................................................... 27

*Super Tire Engineering v. McCorkle*,
    416 U.S. 115, 124 (1974) .................................................................25, 26, 32

*United States v. Peninsula Communications, Inc.*,
    287 F.3d 832, 836 (9th Cir. 2002) ........................................................ 16

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953) ........................................................................ 17, 19

*Vu Luong v. Circuit City Stores, Inc.*,
    368 F.3d 1109 (9th Cir. 2004) ............................................................... 16

## STATUTES

5 U.S.C. § 706(1) .........................................................................1, 3, 7, 23

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

28 U.S.C. § 1346 ...................................................................................... 1

28 U.S.C. § 1391(e)................................................................................... 1

42 U.S.C. § 2000d ................................................................................. 2, 4

42 U.S.C. § 2000d-1 .................................................................................. 4

## RULES

Fed. R. App. P. 4(a)(1)(B).......................................................................... 1

Fed. R. Civ. P. 12(b)(1) .......................................................................... 3, 7

## REGULATIONS

40 C.F.R. Part 7.................................................................................. 2, 4, 7

40 C.F.R. § 7.35(b)................................................................................... 4

40 C.F.R. § 7.115 ............................................................................. 3, 7, 23

40 C.F.R. § 7.115(c)(1) ...................................................................5, 6, 7, 10

40 C.F.R. § 7.120(a).................................................................................. 4

40 C.F.R. § 7.120(c) ................................................................ 5

40 C.F.R. § 7.120(d)(1)(i) .................................................. 5, 10

40 C.F.R. § 7.120(d)(2) ........................................................... 5

## TREATISES

R. Miller & Edward H. Cooper,
*Federal Practice and Procedure* § 3533.7 (3d ed. 2008) ................................. 34

## STATEMENT OF JURISDICTION

### I.     Statutory Basis of Subject Matter Jurisdiction of the District Court

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because the action involves the United States as a defendant and arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1).  Venue was properly vested in the District Court pursuant to 28 U.S.C. § 1391(e) because the cause of action arose within the Eastern District of California and the Plaintiffs and their members reside within that district.

### II.     Jurisdiction of the Court of Appeals and Timeliness of Petition for Review

The District Court granted Defendant's Motion to Dismiss in an Order on February 4, 2013, and issued its Judgment on February 5, 2013.  Excerpt of Record ("ER") 1-18; 22.  The Plaintiffs subsequently filed the Notice of Appeal on April 2, 2013.  ER 19.  The Notice of Appeal was timely filed pursuant to Fed. R. App. P. 4(a)(1)(B).  The Ninth Circuit Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

//

//

//

1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court erred in failing to apply properly the voluntary cessation doctrine pursuant to *Rosemere Neighborhood Association v. EPA,* 581 F.3d 1169 (9th Cir. 2009).

2.     Whether the District Court erred in dismissing El Pueblo's claim for declaratory relief where EPA did not meet its burden in demonstrating mootness.

Pursuant to Circuit Rule 28-2.7, pertinent statutes and rules are included in an addendum bound with the brief.

## STATEMENT OF THE CASE

### I.     Nature of the Case

This action arises from the Defendant Environmental Protection Agency's ("EPA's") unlawful delay in responding to a civil rights complaint filed by Plaintiff El Pueblo Para el Aire Y Agua Limpio pursuant to Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, and EPA's implementing regulations, 40 C.F.R. Part 7.  In 1994, El Pueblo filed a complaint with EPA alleging that ten California agencies and the owners of two toxic waste disposal dumps discriminated against El Pueblo in the siting, permitting, expansion, and operation of the toxic waste dumps.  ER 2.  For years, EPA failed to respond to the complaint in violation of the timelines set forth in EPA's regulations.  ER 3.

El Pueblo initiated this civil action June 30, 2011, under the Administrative

Procedure Act, 5 U.S.C. § 706(1), alleging that EPA's failure to investigate and respond to El Pueblo's complaint in a timely manner is an action unlawfully withheld or unreasonably delayed. ER 231. In its complaint, El Pueblo alleged that the specific instance of unlawful delay that it experienced here was part of a longstanding EPA pattern and practice of unlawful delay in administration of EPA's civil rights program. ER 231, 242. In addition to seeking injunctive relief compelling EPA to process the civil rights complaint, El Pueblo also sought declaratory relief that "EPA's failure to comply with the deadline set forth in the 40 C.F.R. § 7.115, requiring EPA to issue preliminary findings and recommendations for voluntary compliance to the recipient within 180 days of initiating the investigation, constitutes agency action unlawfully withheld and/or unreasonably delayed under the Administrative Procedure Act." ER 242.

Seventeen (17) years after El Pueblo filed its administrative complaint and thirteen (13) months after El Pueblo filed its lawsuit, EPA finally completed its investigation and moved to dismiss the action as moot pursuant to Fed. R. Civ. P. 12(b)(1). ER 203. El Pueblo opposed that motion because EPA failed to carry its heavy burden of proof pursuant to the voluntary cessation exception to mootness. The District Court granted EPA's motion, and this appeal followed.[1]

//

---

[1] El Pueblo was joined below by Plaintiff Padres Hacia Vida Mejor ("Padres"). ER 233-34. Padres did not appeal the judgment of the District Court.

## II.    Background on Title VI of the Civil Rights Act

Title VI of the Civil Rights Act prohibits discrimination by institutions that utilize federal funds.  42 U.S.C. § 2000d.  Section 601 provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  *Id.*  Section 602 requires federal agencies that provide federal funding assistance to issue regulations to effectuate the anti-discrimination provisions of the statute.  42 U.S.C. § 2000d-1.  Specifically, Section 602 requires agencies to create a regulatory framework for processing complaints of racial discrimination in the use of federal funding.  *Id.*

EPA has promulgated rules implementing Title VI for EPA-funded programs.  40 C.F.R. Part 7.  EPA's rules prohibit funding recipients from carrying out programs or activities "which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex * * *."  40 C.F.R. § 7.35(b).

Citizens can file complaints with the EPA alleging discrimination in violation of the regulations.  40 C.F.R. § 7.120(a).  Once a citizen files a complaint with EPA, the Office of Civil Rights (OCR) "will notify the complainant and recipient of the agency's receipt of the complaint within five (5) calendar days."

40 C.F.R. § 7.120(c).  "Within twenty (20) calendar days of acknowledgement of the complaint, the OCR will review the complaint for acceptance, rejection, or referral to the appropriate federal agency."  40 C.F.R. § 7.120(d)(1)(i).  "OCR shall attempt to resolve complaints informally whenever possible."  40 C.F.R. § 7.120(d)(2).  If OCR cannot resolve the complaint informally, it shall issue preliminary findings and recommendations for achieving voluntary compliance "[w]ithin 180 calendar days from the start of the compliance review or complaint investigation."  40 C.F.R. § 7.115(c)(1).  In sum, the regulations require EPA to respond to Title VI complaints no later than 6 months from the date they are accepted for review.

### III.    Statement of Facts and Procedural History

#### A.    El Pueblo's Title VI Complaint and Proceedings Below

El Pueblo Para El Aire y Agua Limpio is an unincorporated association whose members reside in the community of Kettleman City, California.  ER 234. El Pueblo's community is predominantly Latino, and a substantial portion of the population of Kettleman City lives below the poverty line.  ER 2.  Along with Buttonwillow, the community of plaintiff Padres, these two communities contain two out of California's three toxic waste disposal sites.  ER 234.  EPA has distributed federal financial assistance to ten California agencies that are responsible for the permitting and oversight of the toxic waste disposal dumps in

5

Buttonwillow and Kettleman City.  ER 2.

On December 12, 1994, El Pueblo filed an administrative complaint pursuant to Title VI of the Civil Rights Act with EPA alleging that the ten agencies and owners of the two toxic waste dumps discriminated against El Pueblo in the siting, expansion, and operation of the dumps.  *Id.*  EPA accepted El Pueblo's Title VI complaint for investigation on July 18, 1995.  *Id.*  On October 14, 1996, El Pueblo sent a letter to EPA indicating that EPA had failed to comply with the regulatory deadlines in processing El Pueblo's Title VI complaint and that EPA had missed the relevant 180-day deadline, 40 C.F.R. § 7.115(c)(1), by eight months. *Id.*

On December 9, 1996, EPA responded to the October 1996 letter and agreed that it needed to improve its process for investigating and resolving Title VI complaints, and that it had taken steps to improve the processing of Title VI complaints.  *Id.*  For the next fourteen years, however, El Pueblo's civil rights complaint languished in EPA's Office of Civil Rights.  ER 3.

On June 30, 2011, El Pueblo filed suit in the Central District of California alleging that EPA has violated, and continues to violate, 40 C.F.R. § 7.115(c)(1) by failing to issue findings and recommendations in response to El Pueblo's Title VI complaint within 180 days of EPA's initiation of investigation.  ER 231.  El Pueblo alleged that this specific instance of delay was part of a pattern and

6

practice of illegal agency conduct in which EPA "consistently (1) fails to timely accept, reject or refer complaints; and (2) fails to timely issue preliminary findings as required by the regulations in 40 C.F.R. Part 7." ER 232-33. El Pueblo seeks a declaration that EPA's failure to comply with the 180-day deadline set forth in § 7.115 constituted agency action unlawfully withheld and/or unreasonably delayed under the Administrative Procedure Act, 5 U.S.C. § 706(1). ER 242.

On April 27, 2012, EPA field its Answer and denied El Pueblo's allegations that it was violating 40 C.F.R. § 7.115(c)(1) and that this specific instance was part and parcel of a pattern and practice of illegal agency conduct. ER 229.

On July 25, 2012, the parties filed with the District Court a joint scheduling report. ER 206. At that time, EPA reiterated that it "denies [El Pueblo's] claims that it has violated the APA and the agency's Title VI regulations in its processing of [El Pueblo's] Title VI administrative complaint." ER 211. EPA also denied El Pueblo's "claim that EPA's alleged violation amount to a pattern and practice of illegal agency conduct in the administration of EPA's Title VI program." ER 212.

On August 30, 2012, over 17 years after El Pueblo first filed their complaint, EPA finally completed its investigation and dismissed El Pueblo's Title VI complaint. ER 3. EPA then moved to dismiss the case as moot pursuant to Fed. R. Civ. P. 12(b)(1). ER 203. On February 4, 2013, the District Court granted EPA's motion to dismiss. ER 1-18.

With respect to declaratory relief, the District Court did not apply the framework established by this Court in *Rosemere Neighborhood Association,* 581 F.3d at 1169, for determining whether EPA's voluntary compliance moots El Pueblo's claim for failure to Act under the Administrative Procedure Act. ER 14-17. The District Court concluded that El Pueblo's claim for declaratory relief was moot, but then went on to conclude that El Pueblo's allegations did not call into question EPA's interpretation of the timelines set forth in EPA's implementing regulations. *Id.*[2]

### B. EPA's Pattern and Practice of Illegal Delay in Administering the Title VI Program

EPA's pattern and practice of delay in administering its Title VI program was brought to light by this Court in 2009 when it acknowledged that the type of delays Rosemere Neighborhood Association faced then, and El Pueblo faced in this case, were "typical of those who appeal to [EPA] to remedy civil rights violations." *Rosemere*, 581 F.3d at 1175. In the unanimous panel opinion, Judge Tashima took particular note of the fact that between 2006 and 2007, "EPA failed to process a *single* complaint * * * in accordance with its regulatory deadlines." *Id.* (emphasis in original). This Court held that this "*pattern of delay* as shown by the experiences of other parties before an agency can be *relevant to the mootness*

---

[2] El Pueblo does not appeal the District Court's judgment with respect to prospective injunctive relief.

8

*analysis* and helps convince us that this action should go forward." *Id*. (emphasis added) (citing *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174 (9th Cir. 2002)).

Subsequent to the *Rosemere* decision, EPA contracted with Deloitte Consulting ("Deloitte") to conduct a comprehensive review and program evaluation of EPA's Office of Civil Rights ("OCR"), including the operation of the Title VI program. ER 3. Deloitte then issued a report in March 2011 identifying the key issues that plague OCR's implementation of the Title VI program and made recommendations for improvement ("Deloitte Report"). ER 147.

Deloitte's independent review included a statistical analysis of EPA's processing of Title VI complaints. From 1993 to October 2010, OCR received 247 Title VI complaints but only 15 (6%) of those complaints were accepted or rejected within one-month of being filed. For half of the complaints, OCR took over a year to make an initial jurisdictional determination, despite the 20-day deadline in the regulations. ER 172. The report noted that the backlog of Title VI cases at OCR stretches back to 2001. ER 155. At the time the report was issued there were many cases that had been awaiting action up to four years, and two cases that had been waiting action for more than eight years. *Id*.

The Deloitte report also identified specific issues within OCR that contributed to the pattern and practice of delay. For instance, Deloitte observed

9

issues with staff competencies being insufficient to deal with the highly technical nature of complex Title VI complaints and investigations. ER 180-81. The report also noted that this lack of expertise resulted in there being little incentive for prioritizing the Title VI caseload. ER 181. The report concluded by making recommendations for improving the functioning of OCR's Title VI program.

EPA's pattern and practice of delay continued throughout the course of the litigation before the District Court and still continues today. In conjunction with its reply in support of its motion to dismiss, EPA offered the declaration of Mr. Rafael DeLeon, who at that time served as the Director of the Office of Civil Rights, along with additional documents. ER 132. Mr. DeLeon stated that the median time for issuing a jurisdictional determination is "118 days for complaints filed after September 2009," approximately six times the period mandated by EPA's regulations. ER 138. EPA regulations require EPA to issue a jurisdictional determination within twenty (20) days. 40 C.F.R. § 7.120(d)(1)(i). Mr. DeLeon also stated that the median time for investigating and issuing decisions for complaints filed after September 2009 is 321.5 days. ER 138-39. Per its regulations, EPA has 180 days to make preliminary findings of noncompliance. 40 C.F.R. § 7.115(c).

Discovery in this case revealed a more complete picture of EPA's poor track record implementing its Title VI program. In response to Interrogatories

propounded by El Pueblo, EPA provided two spreadsheets that catalogue recent

Title VI complaints, including the date and manner of EPA disposition. Among all

136 Title VI complaints EPA identified for the period of 2004-2012, it appears that

EPA failed to comply with the 20-day jurisdictional determination in every single

case. ER 96.[3] For those complaints EPA accepted for investigation, EPA

completed the investigation within 180 days in only *one* instance. ER 97. Because

of these delays, a substantial backlog of complaints sits on desks in EPA's Office

of Civil Rights. As of November 16, 2012, EPA had twenty-seven (27) open and

pending Title VI complaints. ER 137-38. Of those 27, at least fourteen (14) had

passed the 180-day deadline for EPA to issue preliminary findings. ER 58-79,

117-131.[4] This pattern and practice of agency malfeasance persists, despite

---

[3] EPA asserted that it made a jurisdictional determination within 20 days for
Complaint ID 01R-06-R4 and Complaint ID 12Rr-10-R10. ER 96. Those files are
noted at entries 36 and 97 respectively on Exhibit B, attached to EPA's discovery
response. ER 120, 128. In fact, however, the jurisdictional determination in EPA
Complaint ID 01R-06-R4 took almost five (5) months. ER 120. The jurisdictional
determination in Complaint ID 12Rr-10-R10 took more than a month. ER 128.
From the information EPA provided, its does not appear that EPA complied with
the 20-day period in either case.

[4] EPA identified seven (7) pending Title VI complaints that had exceeded the 180-
day period for EPA to issue preliminary findings. #38 Complaint ID 03R-06-R5,
accepted for investigation on 1/29/09; #52 Complaint ID 03R-07-R9, accepted for
investigation on 5/27/08; #63 Complaint ID 13R-07-R4, accepted for investigation
on 11/23/09; #73 Complaint ID 01R-09-R4, accepted for investigation on 9/9/10,
#88 Complaint ID 07R-10-R4, accepted for investigation on 9/9/10, #96 Complaint
ID 13R-10-R5, accepted for investigation on 7/23/10, #121 Complaint ID 11R-11-
R4, accepted for investigation on 3/22/12. ER 117-31. EPA also had at least

whatever improvements EPA claims to have implemented in its Title VI program.

## SUMMARY OF THE ARGUMENT

This is the second case in recent years to come before this Court illustrating EPA's continued pattern and practice of unlawful delay in carrying out its duties to investigate citizen complaints of civil rights violations under Title VI of the Civil Rights Act.  Here, El Pueblo filed its Title VI complaint on December 12, 1994, seeking redress from EPA for a proposed hazardous waste facility to be located in a community that is predominantly Latino and low income.  Instead of issuing preliminary findings within 180 days of accepting the complaint for investigation, as required by regulation, EPA instead sat on its hands for more than seventeen (17) years.  During those seventeen years, the hazardous waste facility that was sited in El Pueblo's community grew in size while concerns about associated impacts to human health and the environment also increased.

It was only after El Pueblo resorted to seeking judicial review that EPA finally

seven (7) additional Title VI complaints that it had accepted for investigation prior to 2004 but which had not yet been resolved when briefing was completed before the District Court.  Complaint ID 01R-94-R5, accepted for investigation on January, 1995; Complaint ID 08-R-97-R9, accepted for investigation on September, 1997; Complaint ID 10R-98-R2, accepted for investigation on May, 1999; Complaint ID 11R-98-R9, accepted for investigation on December, 2001; Complaint ID 02R-00-R9, accepted for investigation on December, 2001; Complaint ID 09R-02-R6, accepted for investigation on June, 2005; Complaint ID 06R-03-R4, accepted for investigation on September, 2005.  ER 58-79.  To identify those older complaints that are outstanding, refer to those listed as "Accepted" in the second column from the left under "Status."

completed its investigation of El Pueblo's claim on August 30, 2012. Regardless of EPA's long overdue report on El Pueblo's 17-year old civil rights complaint, the outcome of this failure to act case and a judicial declaration regarding EPA's duties under its Title VI regulations are critically important issues for El Pueblo moving forward. The State of California and its agencies are now evaluating proposals to expand significantly the hazardous waste dump in El Pueblo's community. EPA's longstanding pattern and practice of unlawful delay in processing civil rights complaints therefore continues to harm El Pueblo's interests in protecting the civil rights of its community members. El Pueblo therefore seeks declaratory relief that EPA violated a mandatory, non-discretionary duty to investigate El Pueblo's complaint according to the applicable timelines.

The District Court erred in two key respects in dismissing El Pueblo's claims for declaratory relief as moot. First, the District Court erred as a matter of law in holding that there was no active controversy between the parties. El Pueblo specifically pled that EPA had engaged in a pattern and practice of delay and that this specific instance of delay was a part of that pattern, which would continue to impact El Pueblo's interests in advocating for the civil rights of its community members. EPA also specifically denied that it has a non-discretionary duty to comply with the timelines in the applicable regulations and that it had engaged in a pattern of unlawful conduct. Those allegations and EPA's denial thereof were

13

more than sufficient to establish an active controversy fit for judicial review and declaratory relief. El Pueblo's failure to specifically challenge EPA's interpretation of its regulation – an interpretation that had never been issued by the agency or made public - does not shield this dispute from judicial review as held by the District Court.

Second, the District Court erred in failing to apply the voluntary cessation doctrine as an exception to mootness under the test that this Court set out in *Rosemere Neighborhood Ass'n*. As this Court made clear in *Rosemere*, this fact pattern cries out for an exception to the mootness doctrine and EPA bears a "heavy burden" in attempting to dismiss the case. Here, however, the District Court erred in shifting the burden of proof to El Pueblo to demonstrate that its claim for declaratory relief was not moot.

Finally, EPA has not and cannot met its "heavy burden" in demonstrating that El Pueblo's request for declaratory relief is moot, and the order and judgment of the District Court should therefore be reversed with instructions to deny EPA's motion to dismiss. In order to meet its heavy burden, EPA must show either that it is "extremely unlikely" that El Pueblo will file another Title VI complaint with EPA, or that if El Pueblo does file another complaint, EPA will meet its regulatory deadlines in resolving it. EPA has not made either of these showings here.

El Pueblo has demonstrated an on-going interest in protecting its members

from discrimination and that it intends to file another Title VI complaint if and when the California Department of Toxic Substances Control approves the pending permit for expansion of the Kettleman Hills toxic waste dump.  EPA casts these legitimate concerns as mere speculation, but the *Rosemere* Court already rejected similar arguments as inadequate to carry EPA's heavy burden.  EPA must show far more to avoid judicial review of its unlawful actions.

EPA has also failed to demonstrate that it will meet its regulatory deadlines in the future.  EPA has demonstrated a pattern and practice of failing to provide a timely response to Title VI complaints filed by citizen groups, and the delays experienced by El Pueblo are no isolated instance.  EPA's changes and recommendations for reform of the Title VI program, as well as any work already completed in investigating El Pueblo's complaint, are insufficient to demonstrate that El Pueblo will not face further delays by EPA.  The record shows without question that EPA is still failing to meet its regulatory deadlines in numerous cases, and, given its existing backlog of pending complaints, EPA has failed to demonstrate that it is absolutely clear that it would respond in a timely manner to a future complaint from El Pueblo

## ARGUMENT

### I.    Standard of Review

Dismissal for lack of subject matter jurisdiction is reviewed *de novo*.  *Vu*

*Luong v. Circuit City Stores, Inc.,* 368 F.3d 1109, 1111 n2 (9th Cir. 2004); *United States v. Peninsula Communications, Inc.,* 287 F.3d 832, 836 (9th Cir. 2002); *La Reunion Francaise SA v. Barnes,* 247 F.3d 1022, 1024 (9th Cir. 2001). Dismissal of an action on mootness grounds is also reviewed *de novo. S. Or. Barter Fair v. Jackson County, Or.,* 372 F.3d 1128, 1133 (9th Cir. 2004); *Or. Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1116 (9th Cir. 2003).

In resolving the motion to dismiss, the Court should "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Outdoor Media Group Inc. v. City of Beaumont,* 506 F.3d 895, 899-900 (9th Cir. 2007) (citing *Knievel v. ESPN,* 393 F.3d 1068, 1072 (9th Cir. 2005)).

## II.   Mootness, the Voluntary Cessation Doctrine and *Rosemere Neighborhood Association v. EPA*

Mootness is fundamentally a question related to Article III of the United States Constitution, which grants federal courts jurisdiction where there is a "case or controversy." *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n3 (1964). "A claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.,* 126 F.3d 1118, 1123 (9th Cir. 1997). Generally, when an administrative agency completes the action sought by a plaintiff in litigation, "the court 'lacks the ability to grant effective relief,' and the claim is moot." *Rosemere,* 581 F.3d at 1173 (citing *Pub. Util. Comm'n v. FERC,* 100

16

F.3d 1451, 1458 (9th Cir. 1996)).

However, it is a "well-settled" exception to mootness that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the court would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services,* 528 U.S. 167, 189 (2000) (internal citations omitted). "A controversy may remain to be settled in such circumstances, e.g., a dispute over the legality of the challenged practices." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953) (internal citations omitted). The freedom of the defendant to return to his old ways "together with a public interest in having the legality of the practice settled, militates against a mootness conclusion." *Id.* "The courts have rightly refused to grant defendants such a powerful weapon against" the enforcement of the law. *Id.*

The party asserting mootness must therefore establish that no effective relief can be granted. *S. Or. Barter Fair,* 372 F.3d at 1134. This is a "heavy burden." *Porter v. Bowen,* 496 F.3d 1009, 1017 (9th Cir. 2007). "A case is not moot where *any* effective relief may be granted." *Forest Guardians v. Johanns,* 450 F.3d 455, 461 (9th Cir. 1988) (emphasis in original). Because of the potential for future violations, the Supreme Court has developed a test for determining whether the resolution of the alleged illegal conduct may still provide effective

17

relief to the plaintiff – i.e. the voluntary cessation doctrine.  Under this test, the defendant must show that: 1) "subsequent events have made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"; and 2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Porter*, 496 F.3d at 1017 (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)).

In *Rosemere*, this Court not long ago had occasion to apply the voluntary cessation doctrine in a very similar case involving EPA's civil rights program.  In that case, a community group filed a Title VI complaint with EPA alleging retaliation by a recipient of EPA funding.  As it did here, EPA delayed its investigation of these serious allegations well beyond the timelines set forth in EPA's regulations.  The citizens finally resorted to an APA failure to act case, and only then did EPA complete its investigation before moving to dismiss the case as moot.

As the Court in *Rosemere* stated, "'[w]hen the relief sought is an order to the delaying agency to hurry up,' but the agency acts 'to moot [the] case by acting before [the] claim for relief can be decided,' such a sequence 'begs for an exception to the ordinary rules of mootness.'"  581 F.3d at 1175 (quoting *Lucien v. Johnson*, 61 F.3d 573, 574-75 (7th Cir. 1995)).  The Court first clarified the burden of proof, holding EPA, in arguing mootness, bears a "heavy burden" in

demonstrating that it is "absolutely clear" that the allegedly illegal conduct "will not recur if the lawsuit is dismissed." *Id.* at 1173 (citing *Laidlaw,* 528 U.S. at 189). The Court then provided the specific test to be applied for the voluntary cessation exception in Title VI cases. EPA can meet its burden in demonstrating mootness by making one of two showings: "first, showing that it is extremely unlikely that [the plaintiff] will file another complaint (and thus come before the agency again); or, second, by showing that, even if [the plaintiff] does file such a complaint, the EPA will meet its regulatory deadlines in resolving it." *Id.*

### III. EPA Changed its Conduct in Response to the Threat of Judicial Scrutiny.

Here, just as in *Rosemere*, there can be little doubt that EPA changed its conduct specifically because El Pueblo sought judicial review of EPA's unlawful delay. "A change of activity by a defendant under the threat of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or controversy." *Armster v. U.S. D. Ct. for Cent. D. of Cal.,* 806 F.2d 1347, 1357-58 (9th Cir. 1986) (citing *W.T. Grant Co.,* 345 U.S. at 629).

El Pueblo first filed its Title VI complaint with EPA on December 12, 1994. ER 2. EPA accepted the complaint for investigation on July 18, 1995. *Id.* After waiting over a year, El Pueblo notified EPA that it had missed the regulatory deadline for processing the complaint by eight months. *Id.* In December 1996, EPA responded to the letter, acknowledging that it needed to improve its timelines

19

in responding to complaints. *Id.* El Pueblo waited another 14 years, until June 30, 2011, to file this lawsuit. ER 3. EPA finally disposed of El Pueblo's Title VI claim on August 30, 2012, over 17 years after it was filed. *Id.* EPA then moved to dismiss the case as moot.

Furthermore, EPA has offered no other explanation for the timing and sequencing of its voluntary compliance with the complaint investigation procedures. As the District Court noted, there were 27 other complaints pending before EPA at the time El Pueblo filed suit. ER 11. EPA offers no explanation as to why or how it prioritized taking action on El Pueblo's complaint as compared to all other complaints that were pending. The only plausible explanation supported by the facts is that the agency prioritized responding to El Pueblo's complaint because El Pueblo had filed suit. This conclusion is further buttressed by EPA's pattern of similar behavior in *Rosemere*, where it also responded to a Title VI complaint only after litigation had commenced.

### IV.    The District Court Erred in Dismissing El Pueblo's Claim for Declaratory Relief.

In its complaint, El Pueblo alleged that the isolated and discrete instance of unlawful delay was part and parcel of a larger pattern and practice of delay. El Pueblo therefore seeks a declaration that "EPA's failure to comply with the deadline set forth in § 7.115, requiring EPA to issue preliminary findings and recommendations for voluntary compliance to the recipient within 180 days of

20

initiating the investigation, constitutes agency action unlawfully withheld and/or unreasonably delayed under the Administrative Procedure Act." ER 242. In its order dismissing the complaint, the District Court determined first that El Pueblo's claim for declaratory relief was mooted by EPA's resolution of El Pueblo's Title VI complaint. ER 14-15. The Court then went on to hold that El Pueblo did not set forth sufficient allegations in the original complaint to warrant a declaratory judgment. ER 16-17.

El Pueblo respectfully assigns error to both of these holdings but addresses them in the reverse order. The District Court should first have determined whether the complaint, as pled, alleged facts and claims that provide the foundation for a request for declaratory relief. This analysis should have been undertaken before the District Court decided whether that controversy and the request for declaratory relief had been rendered moot by EPA's voluntary compliance.

On the first point, the District Court erred in concluding that El Pueblo failed to plead an active controversy between the parties that warranted declaratory relief. There can be no question that El Pueblo's complaint sets forth a live controversy as to the interpretation of EPA's regulations and whether EPA's behavior here was part and parcel of a pattern and practice of delay. The allegations relating to a pattern and practice of behavior by the agency provide the foundation for El Pueblo's request for a declaratory judgment, and yet the District Court disregarded

those allegation in its opinion.

On the second point, the District Court erred in disregarding this Court's analysis in *Rosemere* and failing to apply the voluntary cessation exception to mootness. In determining mootness, the District Court improperly placed the burden on El Pueblo where it was EPA's heavy burden to demonstrate that the claim for declaratory relief was moot.

### A.     The District Court Erred in Finding that a Declaratory Judgment Would not Provide Effective Relief for El Pueblo.

Taking an extremely narrow view of El Pueblo's complaint, the District Court held that El Pueblo "did not allege that Defendants refuse to interpret § 7.115 as creating a non-discretionary mandatory 180 day deadline, nor did they expressly allege that § 7.115 created a non-discretionary mandatory deadline." *Id*. This holding is in error because it fails to read El Pueblo's complaint in a light most favorable to the non-moving party and because it plainly ignores El Pueblo's allegations of a pattern and practice of unlawful agency delay. "An action for a declaratory judgment is live, not moot, if 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Skysign International v. City and County of Honolulu,* 276 F.3d 1109, 1114 (9th Cir. 2002) (quoting *Pub. Util. Comm'n v. FERC,* 100 F.3d at 1458).

22

First, in the introduction to its Complaint, El Pueblo alleged that the regulations "require EPA to issue preliminary findings within 180 days of accepting the complaint for investigation." ER 232. El Pueblo then stated that it seeks a declaration that EPA "unlawfully withheld a legally mandated action in violation of the APA * * *." ER 233. In its cause of action, El Pueblo alleged that the Administrative Procedure Act empowers a District Court to compel agency action unlawfully withheld. ER 242. El Pueblo then alleged that EPA violated § 7.115(c) because it failed to issue preliminary findings in accordance with the regulatory deadline. *Id*. Similarly, in its prayer for relief, El Pueblo asks that the Court declare that EPA's specific conduct here – its "failure to comply with the deadline set forth in 40 C.F.R. § 7.115" - constituted "agency action unlawfully withheld * * * under the Administrative Procedure Act." *Id*.

These allegations in the Complaint stand in stark contrast to the District Court's holding that El Pueblo did not "expressly allege that § 7.115 created a non-discretionary deadline." ER 16. When viewed in the light most favorable to El Pueblo, *Outdoor Media Group*, 506 F.3d at 899-900, El Pueblo's complaint must fairly be read to call into question the interpretation of EPA's regulations and whether they create a mandatory duty enforceable pursuant to Section 706(1) of the Administrative Procedure Act. As Supreme Court has clarified, at the pleading stage, general allegations regarding the defendant's conduct will suffice and courts

when reviewing a motion to dismiss "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotations omitted). Here, El Pueblo included far more than just general allegations, detailing the agency's decades long history of ignoring this particular civil rights complaint. ER 238-40. Whether El Pueblo alleged specifically that EPA did or did not hold any particular interpretation of § 7.115 is not determinative at the pleading stage of as to whether the allegations invoke the jurisdiction of the District Court to grant declaratory relief. Indeed, to the best of El Pueblo's knowledge, EPA had never made public an interpretation of § 7.115, but it had demonstrated a clear pattern and practice of delay in conflict with the regulation. These allegations of fact formed the basis for El Pueblo's request for declaratory relief.

Moreover, in its Answer, EPA denied that it had a non-discretionary duty to act on El Pueblo's Title VI complaint within 180 days of accepting it for investigation. *Compare* ER 242 (Complaint ¶ 49) *with* ER 229 (Answer ¶ 49). EPA also specifically denied that its regulations require EPA to issue preliminary findings within 180 days. *Compare* ER 232 (Complaint ¶ 4) *with* ER 223-24 (Answer ¶ 4). Lest there be any doubt that El Pueblo and EPA disagreed as to the interpretation of EPA's regulation, when filing a joint status, EPA again denied it had "violated the APA and the agency's Title VI regulations." ER 211.

Second, the District Court disregarded El Pueblo's allegations that EPA's conduct with respect to this specific Title VI complaint was part of a long-standing pattern and practice of unlawful delay on the part of the agency. ER 232-33; 239-42. EPA again denied these allegations. ER 224, 229. In *Rosemere*, the documented pattern of delay on the part EPA convinced this Court that "this action should go forward." 581 F.3d at 1175 (citing *Biodiversity*, 309 F.3d at 1174). This Court did not parse out Rosemere's complaint with a fine-toothed comb to ensure itself that the plaintiff had included explicit allegations as to whether the agency held any particular interpretation of the regulation. The plainly obvious dispute between the parties – combined with EPA's pattern of delay - was more than adequate to satisfy this Court that a live controversy existed at the pleading stage.

The holding in *Rosemere* is further consistent with a line of cases holding that requests for declaratory relief relating to allegations of a pattern and practice of delay by a federal agency are not moot merely because the isolated instance of delay has been voluntarily rectified by the agency. *See, e.g.*, *Del Monte Fresh Produce Company v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (holding that a plaintiff's APA claim for unlawful delay "will not be moot where it seeks declaratory relief as to an ongoing policy") (citing *Super Tire Engineering v. McCorkle*, 416 U.S. 115, 124 (1974)); *Payne Enterprises v. U.S.*, 837 F.2d 486, 491 (D.C. Cir. 1988) (holding under the Freedom of Information Act that if the

25

isolated instance "evidences a policy or practice of delayed" agency action, the case is not moot). Allegations that the isolated instance of delay is related to a pattern and practice are therefore relevant for determining whether a plaintiff has pled facts sufficient to support a request for declaratory relief.

Here, El Pueblo's complaint includes allegations that EPA failed to take a discrete action with respect to a single civil rights complaint under Title VI and that this failure was part and parcel of a much broader, long-standing pattern of agency delay. Those allegations are more than adequate to invoke the court's jurisdiction to issue declaratory relief. This controversy "has not evaporated or disappeared" and continues to cast its shadow on El Pueblo's interests in protecting its members' civil rights in the face of an impending approval of expansion of the Kettleman Hills toxic waste dump. *Super Tire*, 416 U.S. at 122. A declaration that EPA violated the Administrative Procedure Act in failing to comply with the deadline in § 7.115 necessarily speaks to whether or not EPA has a mandatory duty to comply with that deadline in the first instance. The resolution of that issue is extremely meaningful for El Pueblo and its members and has, in fact, been a focal point their work for decades and continues to inform their efforts to this day.

> **B.    The District Court Erred as a Matter of Law in Disregarding *Rosemere* and by Failing to Apply the Appropriate Burden of Proof in Considering EPA's Motion to Dismiss.**

The Supreme Court has described mootness as "the doctrine of standing set

in a time frame" such that the plaintiff's asserted interest "that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Laidlaw,* 528 U.S. at 170 (citation omitted). However, the Court has recognized that differences in the requisite showings for standing and mootness demonstrate that this description is not comprehensive. *Id.*

In an action to force compliance, the plaintiff bears the initial burden of establishing the existence of an Article III case or controversy: that the defendant's allegedly wrongful behavior has caused or will likely cause some threatened injury that is certainly impending. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 104-05 (1998); *Laidlaw,* 528 U.S. at 190 (citation omitted). By contrast, when a defendant claims a case is mooted by its voluntary compliance, the defendant "bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 190. EPA did not challenge El Pueblo's initial standing at the time the complaint was filed; rather, EPA only challenged the court's jurisdiction once EPA had voluntarily disposed of El Pueblo's Title VI complaint. It was therefore EPA's burden to demonstrate that its voluntary compliance mooted all claims for relief. *See Conservation Cong. v. U.S. Forest Serv.*, _ F.3d __, 2013 WL 2631449 at * 3 (Jan. 13, 2013) (slip op. at 10); *Rosemere,* 581 F.3d at 1173.

The District Court, however, placed the burden on El Pueblo to show "'a

27

very significant possibility of future harm.'" ER 14 (quoting *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996)). In *San Diego Gun Rights Comm.*, plaintiff brought a pre-enforcement challenge to the constitutionality of a gun control statute. *Id.* at 1124. Writing for a unanimous panel, Judge Tashima held in that case that plaintiffs did not have standing to seek declaratory judgment because they failed to demonstrate a "genuine threat of prosecution" under the criminal provisions. *Id.* at 1126-27.

This case and *Rosemere* are far different, however, because in these two cases plaintiffs clearly had standing to challenge the agency's unlawful delay at the time the complaint was filed. The question here is whether a defendant's voluntary cessation of the illegal activity can thereafter defeat a court's jurisdiction and render moot an otherwise live controversy. The District Court erred in its analysis because it was EPA that had the burden under the voluntary cessation doctrine and this Court's holding in *Rosemere* to demonstrate that El Pueblo's claim for declaratory relief was moot.

## V.     Applying the Correct Legal Standard, EPA Has Not Met its "Heavy Burden" in Demonstrating Mootness.

In order to meet its burden in demonstrating mootness, EPA must establish that El Pueblo will not face further delays in the processing of its Title VI complaints. *Rosemere,* 581 F.3d at 1173. EPA could satisfy this burden by making one of two showings: first, "that it is *extremely unlikely* that [El Pueblo]

28

will file another complaint (and thus come before the agency again);" or second, "that, even if [El Pueblo] does file such a complaint, the EPA will meet its regulatory deadlines in resolving it." *Id.* (emphasis added). EPA failed to carry its heavy burden under either test.

### A.     EPA has Not Demonstrated that it is "*Extremely Unlikely*" that El Pueblo will File Another Title VI Complaint.

This Court has explicitly recognized that EPA cannot attempt to shift this burden by simply claiming that the plaintiff has not sufficiently demonstrated a likelihood of future delays. *Id.* However, EPA did precisely that before the District Court by claiming that El Pueblo's indication that it only "may" file suit if and when the California Department of Toxic Substances Control permits an expansion of the Kettleman Hills facility was insufficient to show that El Pueblo may face future delays. The District Court accepted this argument as sufficient to distinguish this case from the scenario in *Rosemere,* where the plaintiffs declared that they would "likely" file another complaint. ER 13. This distinction is trivial and cannot serve as the basis for concluding that the wrongful activity will not recur.

To meet its burden, EPA must do more than point to El Pueblo's mental state as to a potential future Title VI complaint; rather it must show that "repetition of the wrongful conduct is highly unlikely." *Rosemere,* 581 F.3d at 1173. The fact that El Pueblo indicated in the Mares-Alatorre declaration that it "'may,' rather

than 'will' or 'likely will,' file a Title VI complaint" is inconsequential.  ER 13, 220.  "[T]he burden is not on [El Pueblo] to show it *will* file another complaint. The burden is on the EPA to show that [El Pueblo] *will not* do so."  581 F.3d at 1174 (emphasis in original).

This burden requires EPA to demonstrate that there is "very little chance" that El Pueblo will "again be subjected to EPA's regulatory and enforcement scheme." *Luckie v. EPA,* 752 F.2d 454, 458-59 (9th Cir. 1985).  In *Luckie,* EPA met its burden because the residents of the community had been permanently removed and relocated such that there was no reasonable expectation that they would again be located atop an asbestos dump or similar site.  *Id.*  Similarly, in *S. Or. Barter,* the court concluded that the case "would be moot if the Fair had entirely ceased to operate, left the business, and no longer sought or intended to seek a license."  372 F.3d at 1134; *see also Rosemere,* 581 F.3d at 1174 ("[W]e note that if Rosemere had dissolved its organization or ended its regulatory reform efforts, we might be more hospitable to EPA's mootness argument.").

El Pueblo's members are still residing in Kettleman City, near the Kettleman Hills toxic waste dump.  ER 220.  El Pueblo has an on-going interest in advocating for the civil rights of its members through Title VI, specifically with regard to the Kettleman Hills facility.  *Id.*  EPA has not demonstrated that El Pueblo faces any "insurmountable" hurdles to filing another complaint.  *S. Or. Barter Fair,* 372 F.3d

at 1134. Therefore, it is possible that El Pueblo will again be subjected to EPA's regulatory scheme for processing Title VI claims. Where there is a question as to whether a plaintiff will again be subject to a particular challenged action, this court requires little more than "a stated intention to resume the actions that led to the litigation." *Rosemere,* 581 F.3d at 1174.

The District Court focused on the fact that a future Title VI complaint would relate to an expansion of the Kettleman Hills facility, which has not yet occurred, and is dependent upon approval, to conclude that it is unlikely that El Pueblo will file another complaint and thus be subject to delays by EPA. ER 13. El Pueblo has demonstrated its on-going interest "in protection against discrimination by the California Department of Toxic Substances Control" and has stated its intent to file another Title VI complaint should DTSC issue the permit for the Kettleman Hills expansion. ER 220, 234. EPA did not dispute below that the DTSC is currently processing a permit application to allow for expansion of the Kettleman Hills toxic waste dump. ER 33. Rather, EPA argued, and the District Court held, that the future approval by DTSC and any corresponding Title VI claims, were too speculative to support a grant of relief to El Pueblo.[5]  ER 47-48.

_____

[5] In July, 2013, the California Department of Toxic Substances and Control issued a public notice of the proposed permit modification for the expansion of the hazardous waste landfill in Kettleman City. *See* http://dtsc.ca.gov/HazardousWaste/Projects/upload/Kettleman_PN_ExpansionDecision_0713.pdf (last viewed August 10, 2013).

The Department's decision whether to approve the pending expansion permit for Kettleman Hills is no more speculative than a future New Jersey-subsidized labor strike, which was at issue in *Super Tire,* 416 U.S. at 115. There the plaintiff tire companies challenged the policy of the State of New Jersey to subsidize labor strikes. Similarly, El Pueblo challenges EPA's denial that it has a non-discretionary duty to meet the deadlines in its regulations and its continued practice of failing to meet those deadlines. In *Super Tire,* the Court held that although the labor strike that gave rise to the litigation had been settled before reaching the Court, there was still a basis for granting relief to petitioners because the challenged "governmental action [did] not rest on the distant contingencies of another strike and the discretionary act of an official." *Id.* at 123.

El Pueblo has an on-going interest in ensuring that EPA is held accountable for unlawful delay so that El Pueblo does not waste its limited resources in making future Title VI claims to EPA that go unanswered. ER 220. "To require the presence of an active and live [ ] dispute would tax [El Pueblo] too much by arbitrarily slighting claims of adverse injury from [ ] governmental action (or the immediate threat thereof)." *Super Tire*, 416 U.S. at 125. It is enough for El Pueblo to show that there is an on-going practice or policy of EPA "that has adversely affected and continues to affect a present interest." *Id.* at 126.

El Pueblo's stated intention to file another Title VI claim if and when DTSC

approves an expansion of the Kettleman Hills facility, along with EPA's denial of its non-discretionary duty to comply with its deadlines, are sufficient to show that there is a "reasonable expectation" that El Pueblo will be subject to the same delays again.  *See Luckie,* 752 F.2d at 458.  EPA has not met its burden in demonstrating that it is "extremely unlikely" that El Pueblo will file another Title VI complaint.  Furthermore, EPA's pattern and practice of failing to meet the regulatory deadlines in responding to and processing Title VI complaints indicates that it will be unable to meet those deadlines should El Pueblo file another complaint.  And, of course, EPA denies in the first instance that its regulations create a nondiscretionary deadline.

> ### B.    EPA Has Not Demonstrated that if El Pueblo Files Another Complaint, EPA Will Meet its Regulatory Deadlines in Resolving It.

Because EPA has failed to meet its burden in demonstrating that El Pueblo will not file another Title VI complaint, it must show that if and when El Pueblo does file another complaint, "EPA will meet its regulatory deadlines in resolving it."  *Rosemere,* 581 F.3d at 1173.  In order to show that it is "absolutely clear" that EPA's unlawful delays in processing El Pueblo's complaints "could not reasonably be expected to recur," EPA must show more than improvements toward meeting its deadlines.  *Rosemere,* 581 F.3d at 1173 (citing *Laidlaw,* 528 U.S. at 189).  EPA must demonstrate that it *will* meet its deadlines.

EPA argued below that the "significant improvements" that have been made to the Title VI program since 2009 aid in demonstrating that El Pueblo is "unlikely to experience delay in the future." ER 49-50. The specific changes to the Title VI program discussed at the District Court included allocating more staff resources, soliciting input from stakeholders, and proposing recommendations for reform of the Title VI program. ER 134-36. The recommendations for reform include establishing a "Title VI [case] Management Protocol," developing guidance to recipients of EPA funding, deciding whether EPA needs regulations with respect to grant recipients, and modifying National Program Management guidance on effective grants management. ER 137. Several of these reform efforts were in draft form and were withheld from production, and the policies they represent had not been fully adopted. ER 84-86.

While the court in *Rosemere* did not consider the issue of whether EPA would be able to meet its deadlines in processing the plaintiff's future complaint, it did note that "EPA's efforts at reform, while laudable, would not automatically moot the case, because 'announcement of an intention to change or adoption of a plan to work toward lawful behavior' is generally insufficient to defeat an exception to mootness." 581 F.3d at 1173, n3 (*citing* R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.7, at 351-52 (3d ed. 2008)). EPA cannot rely on its on-going process of reviewing and improving its Title VI

34

program as a sufficient indicator that it will meet its deadlines in the future. *Id.* Rather, EPA must show that those improvements will ensure that the deadlines are met.

Whatever efforts EPA claims to have made toward improvement, the backlog of complaints and pattern or delay continues within the Title VI program. As the District Court acknowledged, "it is apparent that OCR/EPA on a median level is not meeting § 7.115's deadline." ER 11. The median time for investigating and issuing decisions on Title VI complaints is at 321.5 days, which is still nearly double the 180-day deadline in § 7.115. ER 138. This data alone forecloses any argument that EPA has carried its heavy burden to demonstrate it will process a future Title VI complaint from El Pueblo in compliance with the regulatory deadlines. What is more, the continued delays at EPA have resulted in a substantial backlog of Title VI complaints. As of November 16, 2012, there were twenty-seven (27) open and pending complaints at EPA. ER 137-38. EPA has not indicated how complaints are prioritized or how the 27 pending complaints would impact the processing of a future complaint by El Pueblo. ER 12. EPA's proposed changes and on-going implementation of changes are therefore far from sufficient to demonstrate mootness.

In dismissing El Pueblo's claims, the District Court made clear that it was "not holding that OCR/EPA has resolved its pattern of delay, nor does the Court

intend to address whether delays have been definitively cured." ER 13. In fact the District Court noted, "DeLeon's declaration on its face shows that delays still occur." *Id.* Therefore, EPA's efforts at reforming the program are insufficient to conclude that EPA *will* meet its deadlines should El Pueblo file another Title VI complaint. EPA's performance has not improved to the point of demonstrating that it is "*absolutely clear*" that future delays could not "reasonably be expected to recur." *Rosemere,* 581 F.3d at 1173 (citing *Laidlaw,* 528 U.S. at 189) (emphasis added). EPA has not met its burden in demonstrating that El Pueblo's claim for declaratory relief is moot; the District Court erred in granting EPA's motion to dismiss.

### VI. The Requested Declaratory Judgment Constitutes Effective Relief.

The District Court concluded that because there it was clear that EPA failed to meet the deadline in § 7.115, a declaratory judgment would grant no effective relief to El Pueblo. ER 16-17. El Pueblo argued that the requested declaratory relief would be effective in the present controversy because the issue of whether EPA owes a non-discretionary duty to El Pueblo to act on its civil rights complaints, and whether EPA violated that duty, has a continuing effect on El Pueblo's interests. ER 31-34.

Declaratory judgment is proper where it "will clarify and settle the legal relations at issue and whether it will afford relief from the uncertainty and

controversy giving rise to the proceedings." *Natural Res. Defense Council, Inc. v. EPA,* 966 F.2d 1292, 1299 (9th Cir. 1992). A declaratory judgment constitutes effective relief because: (1) EPA's denial of a non-discretionary duty to process Title VI complaints in compliance with the timelines in the regulations is an active controversy; and (2) El Pueblo has an ongoing interest in addressing potential discrimination in their communities and therefore intends to file a new Title VI complaint if and when the Department of Toxic Substances Control issues the pending permit to expand the Kettleman Hills toxic waste dump. Consistent with EPA's stated denial of its duty to resolve Title VI complaints in a timely manner, EPA's history demonstrates a recurring pattern of delay that the agency believes is lawful and continues to this day. El Pueblo has an on-going interest in resolving this controversy because of its intent to file a future Title VI complaint to protect its members from discrimination and its need to use it limited resources wisely in doing so. Declaratory relief here would resolve the legal dispute and would have a practical effect on El Pueblo's ongoing interests in protecting the civil rights of its members and their community.

## CONCLUSION

For the foregoing reasons, El Pueblo Para el Aire y Agua Limpio respectfully request that the Court reverse the decision below and direct the District Court to enter an order denying EPA's motion to dismiss as moot.

Respectfully submitted,

s/ Christopher G. Winter

_____

Christopher G. Winter
CRAG LAW CENTER

Brent Newell
CENTER FOR RACE POVERTY AND
THE ENVIRONMENT

August 12, 2013

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Appellant El Pueblo Para El Aire y Agua Limpio hereby states that it does not know of any related case pending in this Court.

**Certificate of Compliance Pursuant to 9th Circuit Rules 28-4, 29-2(c)(2) and (3), 32-2 or 32-4 for Case Number 13-15633**

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached Opening Brief of Plaintiff-Appellant El Pueblo Para El Aire y Agua Limpio is proportionally spaces, has a typeface of 14 points, and contains 9,136 words.

Dated this 12th day of August, 2013.

s/ Christopher G. Winter
_____

Christopher G. Winter
CRAG LAW CENTER

Attorney for Plaintiff-Appellant El Pueblo Para El Aire y Agua Limpio

## CERTIFICATE OF SERVICE

I hereby certify that electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 12, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


s/ Christopher G. Winter
_____

Christopher G. Winter
CRAG LAW CENTER


Attorney for Plaintiff-Appellant El Pueblo Para El Aire y Agua Limpio

ADDENDUM

**No. 13-15633**

PADRES HACIA UNA VIDA MEJOR and EL PUEBLO PARA EL AIRE
Y AGUA LIMPIO

*Plaintiffs-Appellants,*

v.

LISA P. JACKSON, Administrator of the U.S. Environmental Protection
Agency, and U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Defendants-Appellees.*

**ADDENDUM TO OPENING BRIEF**

**Table of Contents**

| Pages | Description |
|-------|-------------|
| 1-11 | 40 C.F.R. Part 7 – Nondiscrimination in Programs Receiving Federal Assistance from the Environmental Protection Agency |

## PART 7—NONDISCRIMINATION IN PROGRAMS RECEIVING FEDERAL ASSISTANCE FROM THE ENVIRONMENTAL PROTECTION AGENCY

### Subpart A—General

Sec.
7.10 Purpose of this part.
7.15 Applicability.
7.20 Responsible agency officers.
7.25 Definitions.

### Subpart B—Discrimination Prohibited on the Basis of Race, Color, National Origin or Sex

7.30 General prohibition.
7.35 Specific prohibitions.

### Subpart C—Discrimination Prohibited on the Basis of Handicap

7.45 General prohibition.
7.50 Specific prohibitions against discrimination
7.55 Separate or different programs.
7.60 Prohibitions and requirements relating to employment.
7.65 Accessibility.
7.70 New construction.
7.75 Transition plan.

### Subpart D—Requirements for Applicants and Recipients

7.80 Applicants.
7.85 Recipients.
7.90 Grievance procedures.
7.95 Notice of nondiscrimination.
7.100 Intimidation and retaliation prohibited.

### Subpart E—Agency Compliance Procedures

7.105 General policy.
7.110 Preaward compliance.
7.115 Postaward compliance.
7.120 Complaint investigations.
7.125 Coordination with other agencies.
7.130 Actions available to EPA to obtain compliance.
7.135 Procedure for regaining eligibility.

APPENDIX A TO PART 7—EPA ASSISTANCE PROGRAMS AS LISTED IN THE "CATALOG OF FEDERAL DOMESTIC ASSISTANCE"

AUTHORITY: 42 U.S.C. 2000d to 2000d–4; 29 U.S.C. 794; 33 U.S.C. 1251 nt.

SOURCE: 49 FR 1659, Jan. 12, 1984, unless otherwise noted.

### Subpart A—General

#### § 7.10  Purpose of this part.

This part implements: Title VI of the Civil Rights Act of 1964, as amended; section 504 of the Rehabilitation Act of 1973, as amended; and section 13 of the Federal Water Pollution Control Act Amendments of 1972, Public Law 92–500, (collectively, the Acts).

#### § 7.15  Applicability.

This part applies to all applicants for, and recipients of, EPA assistance in the operation of programs or activities receiving such assistance beginning February 13, 1984. New construction (§ 7.70) for which design was initiated prior to February 13, 1984, shall comply with the accessibility requirements in the Department of Health, Education and Welfare (now the Department of Health and Human Services) nondiscrimination regulation, 45 CFR 84.23, issued June 3, 1977, or with equivalent standards that ensure the facility is readily accessible to and usable by handicapped persons. Such assistance includes but is not limited to that which is listed in the *Catalogue of Federal Domestic Assistance* under the 66.000 series. It supersedes the provisions of former 40 CFR parts 7 and 12.

#### § 7.20  Responsible agency officers.

(a) The EPA Office of Civil Rights (OCR) is responsible for developing and administering EPA's compliance programs under the Acts.

(b) EPA's Project Officers will, to the extent possible, be available to explain to each recipient its obligations under this part and to provide recipients with technical assistance or guidance upon request.

#### § 7.25  Definitions.

As used in this part:

*Administrator* means the Administrator of EPA. It includes any other agency official authorized to act on his or her behalf, unless explicitly stated otherwise.

*Alcohol abuse* means any misuse of alcohol which demonstrably interferes with a person's health, interpersonal relations or working ability.

*Applicant* means any entity that files an application or unsolicited proposal or otherwise requests EPA assistance (see definition for *EPA assistance*).

*Assistant Attorney General* is the head of the Civil Rights Division, U.S. Department of Justice.

*Award Official* means the EPA official with the authority to approve and execute assistance agreements and to take other assistance related actions

1

**§ 7.25**

authorized by this part and by other EPA regulations or delegation of authority.

*Drug abuse* means:

(a) The use of any drug or substance listed by the Department of Justice in 21 CFR 1308.11, under authority of the Controlled Substances Act, 21 U.S.C. 801, as a controlled substance unavailable for prescription because:

(1) The drug or substance has a high potential for abuse,

(2) The drug or other substance has no currently accepted medical use in treatment in the United States, or

(3) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

NOTE: Examples of drugs under paragraph (a)(1) of this section include certain opiates and opiate derivatives (e.g., heroin) and hallucinogenic substances (e.g., marijuana, mescaline, peyote) and depressants (e.g., methaqualone). Examples of (a)(2) include opium, coca leaves, methadone, amphetamines and barbiturates.

(b) The misuse of any drug or substance listed by the Department of Justice in 21 CFR 1308.12–1308.15 under authority of the Controlled Substances Act as a controlled substance available for prescription.

*EPA* means the United States Environmental Protection Agency.

*EPA assistance* means any grant or cooperative agreement, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which EPA provides or otherwise makes available assistance in the form of:

(1) Funds;

(2) Services of personnel; or

(3) Real or personal property or any interest in or use of such property, including:

(i) Transfers or leases of such property for less than fair market value or for reduced consideration; and

(ii) Proceeds from a subsequent transfer or lease of such property if EPA's share of its fair market value is not returned to EPA.

*Facility* means all, or any part of, or any interests in structures, equipment, roads, walks, parking lots, or other real or personal property.

*Handicapped person:*

(a) *Handicapped person* means any person who (1) has a physical or mental impairment which substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. For purposes of employment, the term *handicapped person* does not include any person who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose

employment, by reason of such current drug or alcohol abuse, would constitute a direct threat to property or the safety of others.

(b) As used in this paragraph, the phrase:

(1) *Physical or mental impairment* means (i) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; and (ii) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(2) *Major life activities* means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(3) *Has a record of such an impairment* means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(4) *Is regarded as having an impairment* means:

(i) Has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation;

(ii) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(iii) Has none of the impairments defined above but is treated by a recipient as having such an impairment.

*Office of Civil Rights* or OCR means the Director of the Office of Civil Rights, EPA Headquarters or his/her designated representative.

*Project Officer* means the EPA official designated in the assistance agreement (as defined in *EPA assistance*) as EPA's program contact with the recipient; Project Officers are responsible for monitoring the project.

*Qualified handicapped person* means:

(a) With respect to employment: A handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question.

(b) With respect to services: A handicapped person who meets the essential eligibility requirements for the receipt of such services.

*Racial classifications:* [1]

_____

[1] Additional subcategories based on national origin or primary language spoken may be used where appropriate on either a national or a regional basis. Subparagraphs (a) through (e) are in conformity with Directive 15 of the Office of Federal Statistical Policy and Standards, whose function is now in the Office of Information and Regulatory Affairs, Office of Management and Budget. Should

2

§ 7.35

(a) *American Indian or Alaskan native.* A person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition.

(b) *Asian or Pacific Islander.* A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands. This area includes, for example, China, Japan, Korea, the Philippine Islands, and Samoa.

(c) *Black and not of Hispanic origin.* A person having origins in any of the black racial groups of Africa.

(d) *Hispanic.* A person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, regardless of race.

(e) *White, not of Hispanic origin.* A person having origins in any of the original peoples of Europe, North Africa, or the Middle East.

*Recipient* means, for the purposes of this regulation, any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

*Section 13* refers to section 13 of the Federal Water Pollution Control Act Amendments of 1972.

*United States* includes the states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and all other territories and possessions of the United States; the term *State* includes any one of the foregoing.

## Subpart B—Discrimination Prohibited on the Basis of Race, Color, National Origin or Sex

### § 7.30  General prohibition.

No person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, national origin, or on the basis of sex in any program or activity receiving EPA assistance under the Federal Water Pollution Control Act, as amended, including the Environmental Financing Act of 1972.

that office, or any successor office, change or otherwise amend the categories listed in Directive 15, the categories in this paragraph shall be interpreted to conform with any such changes or amendments.

### § 7.35  Specific prohibitions.

(a) As to any program or activity receiving EPA assistance, a recipient shall not directly or through contractual, licensing, or other arrangements on the basis of race, color, national origin or, if applicable, sex:

(1) Deny a person any service, aid or other benefit of the program;

(2) Provide a person any service, aid or other benefit that is different, or is provided differently from that provided to others under the program;

(3) Restrict a person in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, aid, or benefit provided by the program;

(4) Subject a person to segregation in any manner or separate treatment in any way related to receiving services or benefits under the program;

(5) Deny a person or any group of persons the opportunity to participate as members of any planning or advisory body which is an integral part of the program, such as a local sanitation board or sewer authority;

(6) Discriminate in employment on the basis of sex in any program subject to section 13, or on the basis of race, color, or national origin in any program whose purpose is to create employment; or, by means of employment discrimination, deny intended beneficiaries the benefits of the EPA assistance program, or subject the beneficiaries to prohibited discrimination.

(7) In administering a program or activity receiving Federal financial assistance in which the recipient has previously discriminated on the basis of race, color, sex, or national origin, the recipient shall take affirmative action to provide remedies to those who have been injured by the discrimination.

(b) A recipient shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.

(c) A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program to which this part applies on the grounds of race, color, or national origin or sex; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart.

(d) The specific prohibitions of discrimination enumerated above do not limit the general prohibition of § 7.30.

3

§ 7.45

## Subpart C—Discrimination Prohibited on the Basis of Handicap

### § 7.45  General prohibition.

No qualified handicapped person shall solely on the basis of handicap be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity receiving EPA assistance.

### § 7.50  Specific prohibitions against discrimination.

(a) A recipient, in providing any aid, benefit or service under any program or activity receiving EPA assistance shall not, on the basis of handicap, directly or through contractual, licensing, or other arrangement:

(1) Deny a qualified handicapped person any service, aid or other benefit of a federally assisted program;

(2) Provide different or separate aids, benefits, or services to handicapped persons or to any class of handicapped persons than is provided to others unless the action is necessary to provide qualified handicapped persons with aids, benefits, or services that are as effective as those provided to others;

(3) Aid or perpetuate discrimination against a qualified handicapped person by providing significant assistance to an entity that discriminates on the basis of handicap in providing aids, benefits, or services to beneficiaries of the recipient's program;

(4) Deny a qualified handicapped person the opportunity to participate as a member of planning or advisory boards; or

(5) Limit a qualified handicapped person in any other way in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit or service from the program.

(b) A recipient may not, in determining the site or location of a facility, make selections: (1) That have the effect of excluding handicapped persons from, denying them the benefits of, or otherwise subjecting them to discrimination under any program or activity that receives or benefits from EPA assistance or (2) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the program or activity receiving EPA assistance with respect to handicapped persons.

(c) A recipient shall not use criteria or methods of administering any program or activity receiving EPA assistance which have the effect of subjecting individuals to discrimination because of their handicap, or have the effect of defeating or substantially impairing accomplishment of the objec-

tives of such program or activity with respect to handicapped persons.

(d) Recipients shall take appropriate steps to ensure that communications with their applicants, employees, and beneficiaries are available to persons with impaired vision and hearing.

(e) The exclusion of non-handicapped persons or specified classes of handicapped persons from programs limited by Federal statute or Executive Order to handicapped persons or a different class of handicapped persons is not prohibited by this subpart.

### § 7.55  Separate or different programs.

Recipients shall not deny a qualified handicapped person an opportunity equal to that afforded others to participate in or benefit from the aid, benefit, or service in the program receiving EPA assistance. Recipients shall administer programs in the most integrated setting appropriate to the needs of qualified handicapped persons.

### § 7.60  Prohibitions and requirements relating to employment.

(a) No qualified handicapped person shall, on the basis of handicap, be subjected to discrimination in employment under any program or activity that receives or benefits from Federal assistance.

(b) A recipient shall make all decisions concerning employment under any program or activity to which this part applies in a manner which ensures that discrimination on the basis of handicap does not occur, and shall not limit, segregate, or classify applicants or employees in any way that adversely affects their opportunities or status because of handicap.

(c) The prohibition against discrimination in employment applies to the following activities:

(1) Recruitment, advertising, and the processing of applications for employment;

(2) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;

(3) Rates of pay or any other form of compensation and changes in compensation;

(4) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

(5) Leaves of absence, sick leave, or any other leave;

(6) Fringe benefits available by virtue of employment, whether or not administered by the recipient;

(7) Selection and financial support for training, including apprenticeship, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training;

(8) Employer sponsored activities, including social or recreational programs, or

4

(9) Any other term, condition, or privilege of employment.

(d) A recipient shall not participate in a contractual or other relationship that has the effect of subjecting qualified handicapped applicants or employees to discrimination prohibited by this subpart. The relationships referred to in this paragraph include relationships with employment and referral agencies, with labor unions, with organizations providing or administering fringe benefits to employees of the recipient, and with organizations providing training and apprenticeship programs.

(e) A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(f) A recipient shall not use employment tests or criteria that discriminate against handicapped persons and shall ensure that employment tests are adapted for use by persons who have handicaps that impair sensory, manual, or speaking skills.

(g) A recipient shall not conduct a preemployment medical examination or make a preemployment inquiry as to whether an applicant is a handicapped person or as to the nature or severity of a handicap except as permitted by the Department of Justice in 28 CFR 42.513.

§ 7.65  Accessibility.

(a) *General.* A recipient shall operate each program or activity receiving EPA assistance so that such program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons. This paragraph does not:

(1) Necessarily require a recipient to make each of its existing facilities or every part of an existing facility accessible to and usable by handicapped persons.

(2) Require a recipient to take any action that the recipient can demonstrate would result in a fundamental alteration in the nature of its program or activity or in undue financial and administrative burdens. If an action would result in such an alternation or such financial and administrative burdens, the recipient shall be required to take any other action that would not result in such an alteration or financial and administrative burdens but would nevertheless ensure that handicapped persons receive the benefits and services of the program or activity receiving EPA assistance.

(b) *Methods of making existing programs accessible.* A recipient may comply with the accessibility requirements of this section by making structural changes, redesigning equipment, reassigning services to accessible buildings, assigning aides to beneficiaries, or any other means that make its program or activity accessible to handicapped persons. In choosing among alternatives, a recipient must give priority to methods that offer program benefits to handicapped persons in the most integrated setting appropriate.

(c) *Deadlines.* (1) Except where structural changes in facilities are necessary, recipients must adhere to the provisions of this section within 60 days after the effective date of this part.

(2) Recipients having an existing facility which does require alterations in order to make a program or activity accessible must prepare a transition plan in accordance with § 7.75 within six months from the effective date of this part. The recipient must complete the changes as soon as possible, but not later than three years from date of award.

(d) *Notice of accessibility.* The recipient must make sure that interested persons, including those with impaired vision or hearing, can find out about the existence and location of the assisted program services, activities, and facilities that are accessible to and usable by handicapped persons.

(e) *Structural and financial feasibility.* This section does not require structural alterations to existing facilities if making such alterations would not be structurally or financially feasible. An alteration is not structurally feasible when it has little likelihood of being accomplished without removing or altering a load-bearing structural member. Financial feasibility shall take into account the degree to which the alteration work is to be assisted by EPA assistance, the cost limitations of the program under which such assistance is provided, and the relative cost of accomplishing such alterations in manners consistent and inconsistent with accessibility.

§ 7.70  New construction.

(a) *General.* New facilities shall be designed and constructed to be readily accessible to and usable by handicapped persons. Alterations to existing facilities shall, to the maximum extent feasible, be designed and constructed to be readily accessible to and usable by handicapped persons.

(b) *Conformance with Uniform Federal Accessibility Standards.* (1) Effective as of January 18, 1991, design, construction, or alteration of buildings in conformance with sections 3-8 of the Uniform Federal Accessibility Standards (UFAS) (appendix A to 41 CFR subpart 101–19.6) shall be deemed to comply with the requirements of this section with respect to those buildings. Departures from particular technical and scoping requirements of UFAS by the use of other methods are permitted where substantially equivalent or greater access to and usability of the building is provided.

(2) For purposes of this section, section 4.1.6(1)(g) of UFAS shall be interpreted to exempt from the requirements of UFAS only mechanical

## § 7.75

rooms and other spaces that, because of their intended use, will not require accessibility to the public or beneficiaries or result in the employment or residence therein of persons with physical handicaps.

(3) This section does not require recipients to make building alterations that have little likelihood of being accomplished without removing or altering a load-bearing structural member.

[49 FR 1659, Jan. 12, 1984, as amended at 55 FR 52138, 52142, Dec. 19, 1990]

### § 7.75   Transition plan.

If structural changes to facilities are necessary to make the program accessible to handicapped persons, a recipient must prepare a transition plan.

(a) *Requirements.* The transition plan must set forth the steps needed to complete the structural changes required and must be developed with the assistance of interested persons, including handicapped persons or organizations representing handicapped persons. At a minimum, the transition plan must:

(1) Identify the physical obstacles in the recipient's facilities that limit handicapped persons' access to its program or activity;

(2) Describe in detail what the recipient will do to make the facilities accessible;

(3) Specify the schedule for the steps needed to achieve full program accessibility, and include a year-by-year timetable if the process will take more than one year;

(4) Indicate the person responsible for carrying out the plan.

(b) *Availability.* Recipients shall make available a copy of the transition plan to the OCR upon request and to the public for inspection at either the site of the project or at the recipient's main office.

## Subpart D—Requirements for Applicants and Recipients

### § 7.80   Applicants.

(a) *Assurances.*—(1) *General.* Applicants for EPA assistance shall submit an assurance with their applications stating that, with respect to their programs or activities that receive EPA assistance, they will comply with the requirements of this part. Applicants must also submit any other information that the OCR determines is necessary for preaward review. The applicant's acceptance of EPA assistance is an acceptance of the obligation of this assurance and this part.

(2) *Duration of assurance*—(i) *Real property.* When EPA awards assistance in the form of real property, or assistance to acquire real property, or structures on the property, the assurance will obligate the recipient, or transferee, during the period

the real property or structures are used for the purpose for which EPA assistance is extended, or for another purpose in which similar services or benefits are provided. The transfer instrument shall contain a covenant running with the land which assures nondiscrimination. Where applicable, the covenant shall also retain a right of reverter which will permit EPA to recover the property if the covenant is ever broken.

(ii) *Personal property.* When EPA provides assistance in the form of personal property, the assurance will obligate the recipient for so long as it continues to own or possess the property.

(iii) *Other forms of assistance.* In all other cases, the assurance will obligate the recipient for as long as EPA assistance is extended.

(b) *Wastewater treatment project.* EPA Form 4700–4 shall also be submitted with applications for assistance under Title II of the Federal Water Pollution Control Act.

(c) *Compliance information.* Each applicant for EPA assistance shall submit regarding the program or activity that would receive EPA assistance:

(1) Notice of any lawsuit pending against the applicant alleging discrimination on the basis of race, color, sex, handicap, or national origin;

(2) A brief description of any applications pending to other federal agencies for assistance, and of Federal assistance being provided at the time of the application; and

(3) A statement describing any civil rights compliance reviews regarding the applicant conducted during the two-year period before the application, and information concerning the agency or organization performing the reviews.

(Approved by the Office of Management and Budget under control number 2000–0006)

### § 7.85   Recipients.

(a) *Compliance information.* Each recipient shall collect, maintain, and on request of the OCR, provide the following information to show compliance with this part:

(1) A brief description of any lawsuits pending against the recipient that allege discrimination which this part prohibits;

(2) Racial/ethnic, national origin, sex and handicap data, or EPA Form 4700–4 information submitted with its application;

(3) A log of discrimination complaints which identifies the complaint, the date it was filed, the date the recipient's investigation was completed, the disposition, and the date of disposition; and

(4) Reports of any compliance reviews conducted by any other agencies.

(b) *Additional compliance information.* If necessary, the OCR may require recipients to submit data and information specific to certain programs to determine compliance where there is reason to

§ 7.110

believe that discrimination may exist in a program or activity receiving EPA assistance or to investigate a complaint alleging discrimination in a program or activity receiving EPA assistance. Requests shall be limited to data and information which is relevant to determining compliance and shall be accompanied by a written statement summarizing the complaint or setting forth the basis for the belief that discrimination may exist.

(c) *Self-evaluation.* Each recipient must conduct a self-evaluation of its administrative policies and practices, to consider whether such policies and practices may involve handicap discrimination prohibited by this part. When conducting the self-evaluation, the recipient shall consult with interested and involved persons including handicapped persons or organizations representing handicapped persons. The evaluation shall be completed within 18 months after the effective date of this part.

(d) Preparing compliance information. In preparing compliance information, a recipient must:

(1) [Reserved]

(2) Use the racial classifications set forth in § 7.25 in determining categories of race, color or national origin.

(e) *Maintaining compliance information.* Recipients must keep records for paragraphs (a) and (b) of this section for three (3) years after completing the project. When any complaint or other action for alleged failure to comply with this part is brought before the three-year period ends, the recipient shall keep records until the complaint is resolved.

(f) Accessibility to compliance information. A recipient shall:

(1) Give the OCR access during normal business hours to its books, records, accounts and other sources of information, including its facilities, as may be pertinent to ascertain compliance with this part;

(2) Make compliance information available to the public upon request; and

(3) Assist in obtaining other required information that is in the possession of other agencies, institutions, or persons not under the recipient's control. If such party refuses to release that information, the recipient shall inform the OCR and explain its efforts to obtain the information.

(g) *Coordination of compliance effort.* If the recipient employs fifteen (15) or more employees, it shall designate at least one person to coordinate its efforts to comply with its obligations under this part.

(Approved by the Office of Management and Budget under control number 2000–0006)

### § 7.90  Grievance procedures.

(a) *Requirements.* Each recipient shall adopt grievance procedures that assure the prompt and fair resolution of complaints which allege violation of this part.

(b) *Exception.* Recipients with fewer than fifteen (15) full-time employees need not comply with this section unless the OCR finds a violation of this part or determines that creating a grievance procedure will not significantly impair the recipient's ability to provide benefits or services.

### § 7.95  Notice of nondiscrimination.

(a) *Requirements.* A recipient shall provide initial and continuing notice that it does not discriminate on the basis of race, color, national origin, or handicap in a program or activity receiving EPA assistance or, in programs covered by section 13, on the basis of sex. Methods of notice must accommodate those with impaired vision or hearing. At a minimum, this notice must be posted in a prominent place in the recipient's offices or facilities. Methods of notice may also include publishing in newspapers and magazines, and placing notices in recipient's internal publications or on recipient's printed letterhead. Where appropriate, such notice must be in a language or languages other than English. The notice must identify the responsible employee designated in accordance with § 7.85.

(b) *Deadline.* Recipients of assistance must provide initial notice by thirty (30) calendar days after award and continuing notice for the duration of EPA assistance.

### § 7.100  Intimidation and retaliation prohibited.

No applicant, recipient, nor other person shall intimidate, threaten, coerce, or discriminate against any individual or group, either:

(a) For the purpose of interfering with any right or privilege guaranteed by the Acts or this part, or

(b) Because the individual has filed a complaint or has testified, assisted or participated in any way in an investigation, proceeding or hearing under this part, or has opposed any practice made unlawful by this regulation.

## Subpart E—Agency Compliance Procedures

### § 7.105  General policy.

EPA's Administrator, Director of the Office of Civil Rights, Project Officers and other responsible officials shall seek the cooperation of applicants and recipients in securing compliance with this part, and are available to provide help.

### § 7.110  Preaward compliance.

(a) *Review of compliance information.* Within EPA's application processing period, the OCR will

## § 7.115

determine whether the applicant is in compliance with this part and inform the Award Official. This determination will be based on the submissions required by § 7.80 and any other information EPA receives during this time (including complaints) or has on file about the applicant. When the OCR cannot make a determination on the basis of this information, additional information will be requested from the applicant, local government officials, or interested persons or organizations, including handicapped persons or organizations representing such persons. The OCR may also conduct an on-site review only when it has reason to believe discrimination may be occurring in a program or activity which is the subject of the application.

(b) *Voluntary compliance.* If the review indicates noncompliance, an applicant may agree in writing to take the steps the OCR recommends to come into compliance with this part. The OCR must approve the written agreement before any award is made.

(c) *Refusal to comply.* If the applicant refuses to enter into such an agreement, the OCR shall follow the procedure established by paragraph (b) of § 7.130.

### § 7.115  Postaward compliance.

(a) *Periodic review.* The OCR may periodically conduct compliance reviews of any recipient's programs or activities receiving EPA assistance, including the request of data and information, and may conduct on-site reviews when it has reason to believe that discrimination may be occurring in such programs or activities.

(b) *Notice of review.* After selecting a recipient for review or initiating a complaint investigation in accordance with § 7.120, the OCR will inform the recipient of:

(1) The nature of and schedule for review, or investigation; and

(2) Its opportunity, before the determination in paragraph (d) of this section is made, to make a written submission responding to, rebutting, or denying the allegations raised in the review or complaint.

(c) *Postreview notice.* (1) Within 180 calendar days from the start of the compliance review or complaint investigation, the OCR will notify the recipient in writing by certified mail, return receipt requested, of:

(i) Preliminary findings;

(ii) Recommendations, if any, for achieving voluntary compliance; and

(iii) Recipient's right to engage in voluntary compliance negotiations where appropriate.

(2) The OCR will notify the Award Official and the Assistant Attorney General for Civil Rights of the preliminary findings of noncompliance.

(d) *Formal determination of noncompliance.* After receiving the notice of the preliminary finding of noncompliance in paragraph (c) of this section, the recipient may:

(1) Agree to the OCR's recommendations, or

(2) Submit a written response sufficient to demonstrate that the preliminary findings are incorrect, or that compliance may be achieved through steps other than those recommended by OCR.

If the recipient does not take one of these actions within fifty (50) calendar days after receiving this preliminary notice, the OCR shall, within fourteen (14) calendar days, send a formal written determination of noncompliance to the recipient and copies to the Award Official and Assistant Attorney General.

(e) *Voluntary compliance time limits.* The recipient will have ten (10) calendar days from receipt of the formal determination of noncompliance in which to come into voluntary compliance. If the recipient fails to meet this deadline, the OCR must start proceedings under paragraph (b) of § 7.130.

(f) *Form of voluntary compliance agreements.* All agreements to come into voluntary compliance must:

(1) Be in writing;

(2) Set forth the specific steps the recipient has agreed to take, and

(3) Be signed by the Director, OCR or his/her designee and an official with authority to legally bind the recipient.

### § 7.120  Complaint investigations.

The OCR shall promptly investigate all complaints filed under this section unless the complainant and the party complained against agree to a delay pending settlement negotiations.

(a) *Who may file a complaint.* A person who believes that he or she or a specific class of persons has been discriminated against in violation of this part may file a complaint. The complaint may be filed by an authorized representative. A complaint alleging employment discrimination must identify at least one individual aggrieved by such discrimination. Complaints solely alleging employment discrimination against an individual on the basis of race, color, national origin, sex or religion shall be processed under the procedures for complaints of employment discrimination filed against recipients of federal assistance (see 28 CFR part 42, subpart H and 29 CFR part 1691). Complainants are encouraged but not required to make use of any grievance procedure established under § 7.90 before filing a complaint. Filing a complaint through a grievance procedure does not extend the 180 day calendar requirement of paragraph (b)(2 of this section.

(b) *Where, when and how to file complaint.* The complainant may file a complaint at any EPA of-

fice. The complaint may be referred to the region in which the alleged discriminatory acts occurred.

(1) The complaint must be in writing and it must describe the alleged discriminatory acts which violate this part.

(2) The complaint must be filed within 180 calendar days of the alleged discriminatory acts, unless the OCR waives the time limit for good cause. The filing of a grievance with the recipient does not satisfy the requirement that complaints must be filed within 180 days of the alleged discriminatory acts.

(c) *Notification.* The OCR will notify the complainant and the recipient of the agency's receipt of the complaint within five (5) calendar days.

(d) *Complaint processing procedures.* After acknowledging receipt of a complaint, the OCR will immediately initiate complaint processing procedures.

(1) *Preliminary investigation* (i) Within twenty (20) calendar days of acknowledgment of the complaint, the OCR will review the complaint for acceptance, rejection, or referral to the appropriate Federal agency.

(ii) If the complaint is accepted, the OCR will notify the complainant and the Award Official. The OCR will also notify the applicant or recipient complained against of the allegations and give the applicant or recipient opportunity to make a written submission responding to, rebutting, or denying the allegations raised in the complaint.

(iii) The party complained against may send the OCR a response to the notice of complaint within thirty (30) calendar days of receiving it.

(2) *Informal resolution.* (i) OCR shall attempt to resolve complaints informally whenever possible. When a complaint cannot be resolved informally, OCR shall follow the procedures established by paragraphs (c) through (e) of § 7.115.

(e) *Confidentiality.* EPA agrees to keep the complainant's identity confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder. Ordinarily in complaints of employment discrimination, the name of the complainant will be given to the recipient with the notice of complaint.

(f) [Reserved]

(g) *Dismissal of complaint.* If OCR's investigation reveals no violation of this part, the Director, OCR, will dismiss the complaint and notify the complainant and recipient.

### § 7.125  Coordination with other agencies.

If, in the conduct of a compliance review or an investigation, it becomes evident that another agency has jurisdiction over the subject matter, OCR will cooperate with that agency during the continuation of the review of investigation. EPA will:

(a) Coordinate its efforts with the other agency, and

(b) Ensure that one of the agencies is designated the lead agency for this purpose. When an agency other than EPA serves as the lead agency, any action taken, requirement imposed, or determination made by the lead agency, other than a final determination to terminate funds, shall have the same effect as though such action had been taken by EPA.

### § 7.130  Actions available to EPA to obtain compliance.

(a) General. If compliance with this part cannot be assured by informal means, EPA may terminate or refuse to award or to continue assistance. EPA may also use any other means authorized by law to get compliance, including a referral of the matter to the Department of Justice.

(b) Procedure to deny, annul, suspend or terminate EPA assistance.

(1) *OCR finding.* If OCR determines that an applicant or recipient is not in compliance with this part, and if compliance cannot be achieved voluntarily, OCR shall make a finding of noncompliance. The OCR will notify the applicant or recipient (by registered mail, return receipt requested) of the finding, the action proposed to be taken, and the opportunity for an evidentiary hearing.

(2) *Hearing.* (i) Within 30 days of receipt of the above notice, the applicant or recipient shall file a written answer, under oath or affirmation, and may request a hearing.

(ii) The answer and request for a hearing shall be sent by registered mail, return receipt requested, to the Chief Administrative Law Judge (ALJ) (A–110), United States Environmental Protection Agency, 401 M Street, SW., Washington, DC 20460. Upon receipt of a request for a hearing, the ALJ will send the applicant or recipient a copy of the ALJ's procedures. If the recipient does not request a hearing, it shall be deemed to have waived its right to a hearing, and the OCR finding shall be deemed to be the ALJ's determination.

(3) *Final decision and disposition.* (i) The applicant or recipient may, within 30 days of receipt of the ALJ's determination, file with the Administrator its exceptions to that determination. When such exceptions are filed, the Administrator may, within 45 days after the ALJ's determination, serve to the applicant or recipient, a notice that he/she will review the determination. In the absence of either exceptions or notice of review, the ALJ's determination shall constitute the Administrator's final decision.

9

## § 7.135

(ii) If the Administrator reviews the ALJ's determination, all parties shall be given reasonable opportunity to file written statements. A copy of the Administrator's decision will be sent to the applicant or recipient.

(iii) If the Administrator's decision is to deny an application, or annul, suspend or terminate EPA assistance, that decision becomes effective thirty (30) days from the date on which the Administrator submits a full written report of the circumstances and grounds for such action to the Committees of the House and Senate having legislative jurisdiction over the program or activity involved. The decision of the Administrator shall not be subject to further administrative appeal under EPA's General Regulation for Assistance Programs (40 CFR part 30, subpart L).

(4) *Scope of decision.* The denial, annulment, termination or suspension shall be limited to the particular applicant or recipient who was found to have discriminated, and shall be limited in its effect to the particular program or the part of it in which the discrimination was found.

### § 7.135 Procedure for regaining eligibility.

(a) *Requirements.* An applicant or recipient whose assistance has been denied, annulled, terminated, or suspended under this part regains eligibility as soon as it:

(1) Provides reasonable assurance that it is complying and will comply with this part in the future, and

(2) Satisfies the terms and conditions for regaining eligibility that are specified in the denial, annulment, termination or suspension order.

(b) *Procedure.* The applicant or recipient must submit a written request to restore eligibility to the OCR declaring that it has met the requirements set forth in paragraph (a) of this section. Upon determining that these requirements have been met, the OCR must notify the Award Official, and the applicant or recipient that eligibility has been restored.

(c) *Rights on denial of restoration of eligibility.* If the OCR denies a request to restore eligibility, the applicant or recipient may file a written request for a hearing before the EPA Chief Administrative Law Judge in accordance with paragraph (c) § 7.130, listing the reasons it believes the OCR was in error.

APPENDIX A TO PART 7—EPA ASSISTANCE PROGRAMS AS LISTED IN THE "CATALOG OF FEDERAL DOMESTIC ASSISTANCE"

1. Assistance provided by the Office of Air, Noise and Radiation under the Clean Air Act of 1977, as amended; Pub. L. 95–95, 42 U.S.C. 7401 *et seq.* (ANR 66.001)

2. Assistance provided by the Office of Air, Noise and Radiation under the Clean Air Act of 1977, as amended; Pub. L. 95–95, 42 U.S.C. 7401 *et seq.* (ANR 66.003)

3. Assistance provided by the Office of Water under the Clean Water Act of 1977, as amended; sections 101(e), 109(b), 201–05, 207, 208(d), 210–12, 215–19, 304(d)(3), 313, 501, 502, 511 and 516(b); Pub. L. 97–117; Pub. L. 95–217; Pub. L. 96–483; 33 U.S.C. 1251 *et seq.* (OW 66.418)

4. Assistance provided by the Office of Water under the Clean Water Act of 1977, as amended; section 106; Pub. L. 95–217; 33 U.S.C. 1251 *et seq.* (OW 66.419)

5. Assistance provided by the Office of Water under the Clean Water Act of 1977, as amended; Pub. L. 95–217; 33 U.S.C. 1251 *et seq.* (OW 66.426)

6. Assistance provided by the Office of Water under the Public Health Service Act, as amended by the Safe Drinking Water Act, Pub. L. 93–523; as amended by Pub. L. 93–190; Pub. L. 96–63; and Pub. L. 93–502. (OW 66.432)

7. Assistance provided by the Office of Water under the Safe Drinking Water Act, Pub. L. 93–523, as amended by Pub. L. 96–63, Pub. L. 95–190, and Pub. L. 96–502. (OW 66.433)

8. Assistance provided by the Office of Water under the Clean Water Act of 1977, section 205(g), as amended by Pub. L. 95–217 and the Federal Water Pollution Control Act, as amended; Pub. L. 97–117; 33 U.S.C. 1251 *et seq.* (OW 66.438)

9. Assistance provided by the Office of Water under the Resource Conservation and Recovery Act of 1976; as amended by the Solid Waste Disposal Act; Pub. L. 94–580; section 3011, 42 U.S.C. 6931, 6947, 6948–49 (OW 66.8021)

10. Assistance provided by the Office of Research and Development under the Clean Air Act of 1977, as amended; Pub. L. 95–95; 42 U.S.C. *et seq.*; Clean Water Act of 1977, as amended; Pub. L. 95–217; 33 U.S.C. 1251 *et seq.*, section 8001 of the Solid Water Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976; Pub. L. 94–580; 42 U.S.C. 6901, Public Health Service Act as amended by the Safe Drinking Water Act as amended by Pub. L. 95–190; Federal Insecticide, Fungicide and Rodenticide Act; Pub. L. 95–516; 7 U.S.C. 136 *et seq.*, as amended by Pub. L.'s 94–140 and 95–396; Toxic Substances Control Act; 15 U.S.C. 2609; Pub. L. 94–469. (ORD 66.500)

11. Assistance provided by the Office of Research and Development under the Clean Air Act of 1977, as amended; Pub. L. 95–95; 42 U.S.C. 7401 *et seq.* (ORD 66.501)

12. Assistance provided by the Office of Research and Development under the Federal Insecticide, Fungicide and Rodenticide Act, Pub. L. 95–516, 7 U.S.C. 136 *et seq.*, as amended by Pub. L.'s 94–140 and 95–396 (ORD 66.502)

13. Assistance provided by the Office of Research and Development under the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976; 42 U.S.C. 6901, Pub. L. 94–580, section 8001 (ORD 66.504)

14. Assistance provided by the Office of Research and Development under the Clean Water Act of 1977, as amended; Pub. L. 95–217; 33 U.S.C. 1251 *et seq.* (ORD 66.505)

15. Assistance provided by the Office of Research and Development under the Public Health Service Act as

10

amended by the Safe Drinking Water Act, as amended by Pub. L. 95–190. (ORD 66.506)

16. Assistance provided by the Office of Research and Development under the Toxic Substances Control Act; Pub. L. 94–469; 15 U.S.C. 2609; section 10. (ORD 66.507)

17. Assistance provided by the Office of Administration, including but not limited to: Clean Air Act of 1977, as amended, Pub. L. 95–95; 42 U.S.C. 7401 et seq., Clean Water Act of 1977, as amended; Pub. L. 95–217; 33 U.S.C. 1251 et seq.: Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976; 42 U.S.C. 6901, Pub. L. 94–580; Federal Insecticide, Fungicide and Rodenticide Act; Pub. L. 92–516; 7 U.S.C. 136 et seq. as amended by Pub. L.'s 94–140 and 95–396; Public Health Service Act, as amended by the Safe Drinking Water Act, as amended by Pub. L. 95–190. (OA 66.600)

18. Assistance provided by the Office of Administration under the Clean Water Act of 1977, as amended; Pub. L. 95–217; section 213; 33 U.S.C. 1251 et seq. (OA 66.603)

19. Assistance provided by the Office of Enforcement Counsel under the Federal Insecticide and Rodenticide Act, as amended; Pub. L. 92–516; 7 U.S.C. 136 et seq., as amended by Pub. L. 94–140, section 23(a) and Pub. L. 95–396. (OA 66.700)

20. Assistance provided by the Office of Solid Waste and Emergency Response under the Comprehensive Environmental Responses, Compensation and Liability Act of 1980; Pub. L. 96–510, section 3012, 42 U.S.C. 9601, et seq. (OSW – number not to be assigned since Office of Management and Budget does not catalog one-year programs.)

21. Assistance provided by the Office of Water under the Clean Water Act as amended; Pub. L. 97–117, 33 U.S.C. 1313. (OW – 66.454)